# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1947

_____

Yu An Li

*Petitioner*

v.

Eric H. Holder, Jr.

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: January 13, 2014
Filed: March 13, 2014

_____

Before WOLLMAN and SHEPHERD, Circuit Judges, and WEBBER,[1] District
Judge.

_____

WEBBER, District Judge.

_____

[1]The Honorable E. Richard Webber, Senior United States District Judge for the
Eastern District of Missouri, sitting by designation.

I.

Mr. Li is a native and citizen of China. He entered the United States on February 26, 2009, as a non-immigrant visitor, with authorization to remain in the United States for a temporary period not to exceed May 25, 2009. Mr. Li remained in the United States beyond May 25, 2009, without authorization from immigration officials.

On May 26, 2009, Mr. Li filed an Application for Asylum and for Withholding of Removal with the United States Citizenship and Immigration Services. See 8 U.S.C. §§ 1231(b)(3), 1258(a); 8 C.F.R. §§ 1208.16-.18. In his Application, Mr. Li claimed to have suffered past persecution in China on account of his Christian faith. Mr. Li stated he was four years old when his father was arrested and sentenced to a ten-year term of imprisonment for rebelling against China's Cultural Revolution. Mr. Li alleged his friends subsequently "brought [him] to Christianity and [he] believed in God." He claimed he developed a successful real estate business, and because he "was doing better than expected[, he] felt [like] giving back to the society and people of faith." He stated he bought Bibles and hymn books from a client in Hong Kong, and distributed them to associates in his company. Mr. Li asserted one of these associates turned him in to the Chinese government, which then became watchful and suspicious of Mr. Li. Mr. Li further alleged, on October 5, 2008, the police learned he was conducting Christian gatherings in his home, broke into his house, confiscated his Bibles and hymn books, and arrested him for distributing Christian books and materials. Mr. Li claimed the police beat him several times during questioning to get him to reveal the source of the books, but the officers later released him when his family and friends posted bond.

On February 10, 2010, Asylum Officer Laurie Kuriakose interviewed Mr. Li regarding his Application. Mr. Li used his own interpreter at the interview, but Officer Kuriakose also arranged for a telephonic interpreter to monitor the interview

and ensure Mr. Li's interpreter was interpreting correctly. In response to questioning, Mr. Li stated he began believing in God in 1999, when a neighbor took him to an official Government church. After this visit, however, Mr. Li only attended a "home"[2] church. He claimed he attended this home church once or twice monthly for five years, beginning in November 1999, and the church gatherings consisted of ten people, at most. Mr. Li was unable to provide Officer Kuriakose names of the people who attended his church, and he told her he knew the names of only two or three of the people who attended the church, because the members referred to each other only as "Brother," or "Sister." He alleged, beginning in 2005, he hosted the gatherings at his home every five-to-ten days, and he was "in charge" and "ran the meetings." Mr. Li stated he played audio tapes on Christian topics at these meetings, and the group sang hymns, read the Bible, prayed, and ate together. He said a typical service lasted approximately one hour.

Mr. Li also told Officer Kuriakose that, in May 2008, a friend in Hong Kong sent him ten boxes of Bibles, some of which he distributed to his employees. He claimed when the Chinese police came to his house on October 5, 2008, they were undercover, arriving dressed as utility company employees, and asking for payment of his water bill. Mr. Li said they arrested him, but did not arrest the other church members who were at his house, because he told the police the others were only at his home to eat a meal with him, and had nothing to do with the Bibles he had been distributing. Mr. Li claimed he was charged with the illegal transport of religious documents and illegally spreading the Christian religion. He stated the police detained him for eleven days, a period during which he endured beatings and torture, explaining they pulled his hair, beat him, and used "super bright lights on [him] and wouldn't let [him] close his eyes." Mr. Li was unspecific about the beatings, first stating he could not clearly remember how many times he was beaten. When Officer

---

[2]A "home" or "underground" church is a church not sanctioned by the Chinese government.

Kuriakose tried to get Mr. Li to be more specific, he said he was beaten only once. Subsequently, Mr. Li claimed he was beaten on two occasions. When Officer Kuriakose asked Mr. Li if they beat him another time, he said the police did not beat him. He said he was released from police custody because his family and church friends posted bond for him. Mr. Li stated he thereafter reported weekly, as required, at the local police station until February 20, 2009.

Mr. Li told Officer Kuriakose he avoided being detected prior to his October 2008 arrest by being extremely careful and cautious; he stated that, whenever someone new expressed an interest in joining his home church, the individual would be led to the Government church, to ensure he or she truly believed in God, before being invited to his home church.

Officer Kuriakose referred Mr. Li's Application to the Immigration Court for a merits hearing. Proceedings were initiated by the Department of Homeland Security, which issued a Notice to Appear, dated July 1, 2010, charging Mr. Li with removability under 8 U.S.C. § 1227(a)(1)(B), Immigration and Nationality Act § 237(a)(1)(B). Mr. Li admitted the allegations in the Notice to Appear, and conceded removability. He renewed his application for asylum and related relief, and alternatively requested voluntary departure.

On August 1, 2011, Mr. Li testified before United States Immigration Judge John O'Malley (IJ). During the hearing, several discrepancies emerged in Mr. Li's testimony. The IJ denied relief, finding Mr. Li lacked credibility. In making this determination, the IJ noted several of the inconsistencies in Mr. Li's testimony, and he found Mr. Li was unable to meet his burden to establish that he did not give false testimony to obtain a benefit under the Immigration and Nationality Act. The IJ alternatively found Mr. Li did not merit a favorable exercise of discretion in light of his adverse credibility determination. In addition to denying Mr. Li's applications for asylum, withholding of removal under the Immigration and Nationality Act,

withholding of removal under the Convention Against Torture (CAT), see 8 C.F.R. §§ 1208.16 - .18, and for post-conclusion voluntary departure, the IJ ordered that Mr. Li be removed from the United States to China on the charges contained in his Notice to Appear.

On March 28, 2012, the Board of Immigration Appeals (BIA) dismissed, as untimely, an appeal of the IJ's decision, and returned the record to the Immigration Court without further action. However, the BIA subsequently granted Mr. Li's motion to reconsider the March dismissal, and accepted his appeal on certification.

In his appeal to the BIA, Mr. Li argued the IJ's adverse credibility determination was not supported by the record and focused on immaterial and minor inconsistencies. Mr. Li claimed the IJ's credibility determination required reversal, because the IJ erred as a matter of law and abused his discretion. Mr. Li further argued the IJ erred by evaluating his alleged lack of knowledge of Christianity in making the adverse determination. Mr. Li also asserted the IJ erred in denying him voluntary departure, claiming the IJ incorrectly shifted the burden of proof to him.

The BIA dismissed Mr. Li's appeal, noting many of the inconsistencies cited by the IJ in his decision, and finding the IJ's adverse credibility determination was not clearly erroneous. The BIA found the IJ's denial of asylum was correct, as Mr. Li failed to establish a credible claim based on his participation in an underground church. The BIA further found Mr. Li necessarily failed to satisfy the higher burden required for withholding of removal. It noted Mr. Li did not raise on appeal any substantive claims under the CAT, and concluded that application was not properly before it. The BIA further found no error in the IJ's exercise of discretion when he denied Mr. Li's application for voluntary departure. The BIA concluded that the IJ provided a hearing that was fundamentally fair, properly held that Mr. Li did not qualify for his requested forms of relief, and found Mr. Li raised no arguments on

appeal which would cause it to reverse the IJ's decision or to remand the matter for further proceedings.

Mr. Li now petitions for review of the BIA order, arguing that the BIA's adverse credibility determination was unsupported by substantial evidence and did not comport with due process, because the BIA did not provide specific, cogent reasons for its determination in light of precedent and the record as a whole. Mr. Li also argues the BIA failed to address all of his arguments on appeal.

II.

The Attorney General has discretion to grant asylum to a refugee; that is, an alien who is unwilling or unable to return to his country of origin due to persecution or a well-founded fear of future persecution on the basis of, among other things, religion. Falaja v. Gonzales, 418 F.3d 889, 894 (8th Cir. 2005). The alien petitioning for asylum has the burden of proving past persecution or a well-founded fear of future persecution on one of the protected bases enumerated in 8 U.S.C. § 1158(b)(1)(B)(i). See Falaja, 418 F.3d at 894. A well-founded fear is one both "'subjectively genuine and objectively reasonable.'" Id. (quoting Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir. 1993)).

Review of the BIA's denial of asylum is for abuse of discretion; the factual findings underlying an adverse determination are reviewed under the substantial evidence standard. Gaitan v. Holder, 671 F.3d 678, 680 (8th Cir. 2012). This Court reviews constitutional claims and legal questions de novo, but accords substantial deference to the BIA's interpretation of immigration statutes and regulations. Id. We generally review the BIA decision, as the final agency action; however, to the extent the BIA adopted findings or reasoning of the IJ, the Court also reviews the IJ's decision as part of the final agency action. Falaja, 418 F.3d at 894.

An IJ's adverse credibility determination is given "much weight because the IJ sees the witness testify and is therefore in the best position to determine his or her credibility." Ali v. Holder, 686 F.3d 534, 538 (8th Cir. 2012) (internal quotations and citation omitted). The BIA's findings of fact, including credibility determinations, must be supported by "substantial evidence." Id.; Puc-Ruiz v. Holder, 629 F.3d 771, 777 (8th Cir. 2010). Such findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Ali, 686 F.3d at 538. However, although the Court generally defers to the IJ's credibility findings, its deference is restrained if the IJ's stated reasons "reflect improper bias or impermissible speculation." Jian He Zhang v. Holder, 737 F.3d 501, 505 (8th Cir. 2013). Moreover, the IJ must provide specific, convincing reasons, adequately explained and supported by the record, for disbelieving an applicant's testimony. Id.

Factors upon which the IJ may base his credibility determination include the applicant's "demeanor, candor, or responsiveness[,] the consistency between [his] written and oral statements, the internal consistency of his testimony, the consistency of [his] statements with other record evidence, and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Ali, 686 F.3d at 538 (internal quotations and citations omitted). Mr. Li argues the BIA failed to evaluate his credibility under the totality of the circumstances, and focused on immaterial and minor inconsistencies to the detriment of the material testimony and evidence of record. Mr. Li further argues that, even if there were actual discrepancies or inconsistencies material to his claim, he adequately explained them. He claims the IJ also rested his credibility determination on Mr. Li's lack of knowledge of Christian theology, and contends the BIA violated his right to due process under the Fifth Amendment by refusing to address this issue on appeal.[3] Our review of the IJ's decision as part of

---

[3] In a footnote to his brief, Mr. Li appears to claim the hearing transcript shows serious errors in translation limited his ability to communicate his understanding of

the final agency action is limited to the extent the BIA adopted findings or reasoning of the IJ. Here, the BIA adopted most of the IJ's findings with respect to discrepancies in Mr. Li's statements, but did not consider a lack of understanding of Christian concepts or beliefs to be material to Mr. Li's asylum claim. Instead, the BIA determined the other identified discrepancies, taken as a whole, supported the IJ's adverse credibility finding; thus, we examine only that part of the IJ's decision the BIA adopted.

We first consider Mr. Li's totality-of-the-circumstances argument concerning the adverse credibility determination. Our review of the factual findings, including the IJ's adverse credibility determination, is for substantial evidence. Ali, 686 F.3d at 538. In reaching his conclusion that Mr. Li was not credible, the IJ noted several material discrepancies in Mr. Li's testimony, detailing numerous instances where his testimony was internally inconsistent, and where it was inconsistent with previous statements Mr. Li had provided in connection with his application. Additionally, the IJ specifically commented on Mr. Li's non-responsive and evasive manner of testifying, especially when asked to reconcile some of the inconsistencies in his testimony.

During his hearing before the IJ, Mr. Li testified he began attending a home church in 1997, and he said he never attended a government-sanctioned church. This testimony, however, contradicted his statements to Officer Kuriakose, in which he asserted he started believing in God in 1999, first attended a government-sanctioned church in 1999, and then attended a home church. During his asylum interview, Mr. Li also told Officer Kuriakose he initially led prospective church members to a government-sanctioned church to ascertain whether they truly believed in God, but

_____

Christian concepts or beliefs; however, he fails to identify any errors that may have impeded his ability to testify. Our review of the transcript and other record evidence reveals no significant issue with translation, understanding, or communication.

he testified before the IJ he met with prospective members for dinner or lunch at a restaurant. When asked to explain the discrepancy between his representations regarding his attendance at a government-sanctioned church, Mr. Li stated he initially thought the first church he attended was government-sanctioned, but he later learned it was an underground church. The IJ found this explanation unpersuasive, because Mr. Li would have learned "whether or not the church in question was government-sanctioned prior to his asylum interview."

Mr. Li also testified inconsistently with statements he made to Officer Kuriakose concerning home church meetings he hosted and attended. Mr. Li told Officer Kuriakose he began hosting meetings every five-to-ten days in 2005. However, when he testified before the IJ, Mr. Li said he first hosted meetings in 2006, and the meetings occurred approximately once every two months. Mr. Li told Officer Kuriakose he ran the meetings and played audio tapes, but, in his testimony before the IJ, Mr. Li said a preacher ran the meetings, and Mr. Li failed to mention any use of audio tapes. Mr. Li told Officer Kuriakose that, prior to 2005, he attended the underground church once each month, and sometimes twice monthly. Yet, in his testimony, Mr. Li said he attended every week, unless he was ill.

Another discrepancy the IJ noted between Mr. Li's statements to Officer Kuriakose and his hearing testimony concerned Bibles he said he received from Hong Kong. Mr. Li told Officer Kuriakose he received Bibles in May 2008, but he testified he received them in 2007. Similarly, Mr. Li asserted in a statement that, after he traveled to the United States on February 26, 2009, police searched his family's homes because Mr. Li did not "report to them on time"; yet, he testified he fulfilled his reporting duties as of February 21, 2009, which the IJ noted would eliminate any reason for the police to be looking for him for failure to report in a timely fashion.

Several inconsistencies concerning his arrest and detainment also appeared in the statements made by Mr. Li. The IJ found Mr. Li's inconsistent descriptions of the

events that took place on the date of his alleged arrest "[p]erhaps the most troubling." Mr. Li told Officer Kuriakose that police came to his home undercover, acting as utility company employees, and arrested only him. However, he testified before the IJ that the police came clothed in police uniform and also arrested church members who were at his house. Additionally Mr. Li stated during the hearing that seven members were arrested, but he subsequently provided the names of eight individuals allegedly taken with him to the police station. Mr. Li's ability to recall so many names of church members during the hearing contrasts rather starkly with his earlier representation to Officer Kuriakose, when he stated he knew the names of only two or three individuals attending the home gatherings. Mr. Li's inconsistent statements regarding the arrest events were not rectified by his corroborating evidence, because the statement provided to corroborate his claim was also inconsistent with Mr. Li's various representations, e.g., his brother stated over twenty individuals were taken to the police department when Mr. Li was arrested. When asked why he did not previously mention that other individuals were arrested with him, he replied, "We were all taken to the police station and because I was the organizer I was detained and I don't know if all of the others were detained or not." Mr. Li further explained he understood the difference between the words "detained" and "arrested," and he said being arrested "means, we're all taken away, put in jail."

Mr. Li's statements regarding his treatment after his arrest were also inconsistent. In a July 14, 2011 written statement submitted to the Immigration Court for consideration at the removal hearing, Mr. Li reported that the police used a "very strong light to irradiate [his] eyes and beat [him] with [a] baton." During his hearing before the IJ, Mr. Li failed to mention use of a baton, testifying only that the police used their hands to beat him. He said they "used their hand, grabbed my hair and beat me several times." Mr. Li also testified the police encouraged other inmates to beat him, but he failed to apprise Officer Kuriakose of this detail during his asylum interview. When questioned about the discrepancies between his reports and

-10-

testimony, Mr. Li often responded he did not clearly remember, or recall exactly, what he had said earlier.

In light of the numerous discrepancies, Mr. Li's evasiveness and non-responsive explanations, and Mr. Li's unpersuasive attempts to reconcile his inconsistent statements, the IJ found Mr. Li not credible. He further found none of Mr. Li's corroborative evidence, including the statement provided by Mr. Li's brother, was sufficiently detailed, relevant, or persuasive enough to rectify Mr. Li's testimony or otherwise establish he met the definition of a refugee.

The adverse credibility determination was supported by substantial evidence in the record. We uphold the adverse credibility determination, as a reasonable adjudicator would not be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B). We further find the BIA's decision that Mr. Li is not eligible for asylum is supported by substantial evidence. Because we hold Mr. Li failed to demonstrate he was eligible for asylum, we also hold he failed to meet the higher burden of proof required for obtaining withholding of removal. See Falaja, 418 F.3d at 897. Furthermore, any claim Mr. Li would have sought under the CAT has been waived, because he has not raised this issue on appeal. We further conclude any such claim would fail, as it would rest on his discredited testimony. See Ali, 686 F.3d at 538-39; Falaja, 418 F.3d at 897. Finally, we find no error in the IJ's exercise of discretion when he denied Mr. Li's application for voluntary departure.

III.

Because we uphold the agency's adverse credibility finding, Mr. Li cannot prevail on his challenges to the decisions of the IJ and BIA. His asylum and withholding claims likewise fail, as they rest on his discredited testimony. Accordingly, we deny the petition for review.

_____

-11-