**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1978

MARIA DEL REFUGIO ARITA-DERAS; L.A.P.A.,

Petitioners,

v.

ROBERT M. WILKINSON, Acting Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 10, 2020                                        Decided: March 4, 2021

Before GREGORY, Chief Judge, and AGEE and KEENAN, Circuit Judges.

Petition for review granted by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Gregory and Judge Agee joined.

**ARGUED:** Sam Hsieh, CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, Washington, D.C.; Amanda Shafer Berman, CROWELL & MORING LLP, Washington, D.C., for Petitioner. R. Trent McCotter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Adina Appelbaum, CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, Washington, D.C.; Yao Mou, Los Angeles, California, Clifton S. Elgarten, Tiana Russell, Amanda Shafer Berman, CROWELL & MORING LLP, Washington, D.C., for Petitioner. Joseph H. Hunt, Assistant Attorney General, Stephen J. Flynn, Assistant Director, James A. Hurley, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF

JUSTICE, Washington, D.C., for Respondent.

———————————

BARBARA MILANO KEENAN, Circuit Judge:

Maria Del Refugio Arita-Deras, a native and citizen of Honduras, petitions for review of a final order of removal entered by the Board of Immigration Appeals (the Board).[1]  The Board affirmed an immigration judge's (IJ) conclusion that Arita-Deras was not eligible for asylum, withholding of removal, or protection under the Convention Against Torture (CAT).  The Board: (1) agreed with the IJ that Arita-Deras failed to support her claims with sufficient corroborating evidence; (2) found that Arita-Deras failed to prove that she suffered from past persecution because she had not been harmed physically; and (3) concluded that Arita-Deras failed to establish a nexus between the alleged persecution and a protected ground.

Upon our review, we conclude that the Board improperly discounted Arita-Deras' corroborating evidence, applied an incorrect legal standard for determining past persecution, and erred in its nexus determination.  Accordingly, we grant Arita-Deras' petition and remand her case to the Board for further proceedings.

I.

In April 2013, Arita-Deras entered the United States near Hidalgo, Texas, without authorization and was detained by immigration officials.  She was placed in expedited removal proceedings, released, and allowed to proceed to North Carolina.  Over two years

---

[1] Arita-Deras' minor son joins her application for asylum and petition for review. For ease of discussion, we refer to Arita-Deras as the applicant and petitioner in this opinion.  Our conclusions, however, apply equally to her minor son's derivative claims for relief from removal.  *See* 8 U.S.C. § 1158(b)(3)(A).

later, the Department of Homeland Security served Arita-Deras with a Notice to Appear initiating removal proceedings, after which Arita-Deras filed an application for asylum.

The IJ conducted a hearing, at which Arita-Deras appeared pro se. After being informed at the hearing that asylum relief was not available for victims "of a crime or . . . extort[ion] for money," Arita-Deras consented to the IJ's suggestion that she leave the United States voluntarily. However, three months later, Arita-Deras moved through counsel to reopen her case, and the IJ granted her motion.

Arita-Deras filed a new application for asylum, withholding of removal, and CAT relief. In the application, she claimed past persecution and fear of future persecution based on her membership in a particular social group, namely, the nuclear family of her husband, Luis Pineda-Vidal. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), 1231(b)(3)(A). She asserted that she and Pineda-Vidal had been subject to death threats by a gang in Honduras. To corroborate her claims, Arita-Deras attached several documentary submissions to her application, including (1) her own affidavit and affidavits from Pineda-Vidal, one of her brothers-in-law, her mother-in-law, and her sister-in-law; (2) burial permits for Pineda-Vidal's deceased brother and brother-in-law; and (3) a death and burial certificate for Pineda-Vidal's father.

Arita-Deras testified at the hearing about the threats and the violence to which the gang had subjected her and her family. According to Arita-Deras, Pineda-Vidal previously had lived in the United States before returning to Honduras of his own accord. During his time in the United States, Pineda-Vidal befriended Ricardo, a man originally from the same village in Honduras. Both Pineda-Vidal and Ricardo returned to La Laguna, Honduras

4

upon leaving the United States. Pineda-Vidal began living with Arita-Deras in La Laguna, while Ricardo became the leader of a local gang.

After the two men returned to Honduras, Ricardo grew jealous of Pineda-Vidal's perceived economic success. Ricardo began appearing at the home of Pineda-Vidal and Arita-Deras, yelling for Pineda-Vidal to come outside "so that they could kill each other." In response, Pineda-Vidal stayed exclusively inside his house except to go to work. In addition to the direct threats to Pineda-Vidal, Ricardo issued threats against members of Pineda-Vidal's family.

Eventually, in response to the ongoing threats, Arita-Deras and Pineda-Vidal moved to El Espiritu, Honduras, a town located about one and one-half hours away from La Laguna. Shortly after their move, the couple received multiple calls from the father-in-law of Pineda-Vidal's brother, telling them that Ricardo would kill them if they returned to La Laguna. One year later, Ricardo killed Pineda-Vidal's brother and brother-in-law, who had remained in La Laguna, by shooting both men after convincing them to come outside their house. Arita-Deras testified that Ricardo killed both men because he could not harm Pineda-Vidal directly. The family reported the murders to the police, but the police took no action. In response to the murders, Pineda-Vidal and Arita-Deras fled with their family to Santa Barbara, Honduras, a town four and one-half hours away from La Laguna.

A few months after their move to Santa Barbara, Pineda-Vidal and Arita-Deras drove with their son and Pineda-Vidal's brother to a birthday celebration in El Espiritu. During the drive back to Santa Barbara, occupants in another car began shooting at their car. Pineda-Vidal identified the attackers as Ricardo and other members of Ricardo's gang.

5

Pineda-Vidal also received a telephone call during the trip informing him that Ricardo had killed Pineda-Vidal's father.

Fearing for their lives, Pineda-Vidal and his brother left for the United States shortly after the shooting.[2] Arita-Deras returned to El Espiritu with her son to stay with Pineda-Vidal's sister, rarely leaving the house due to her fear of Ricardo and his gang. After her return to El Espiritu, Arita-Deras began receiving threatening notes. The first note, left outside her home, included a threat to kidnap and kill her and her son if Pineda-Vidal did not return to Honduras. The second note, which reiterated the message from the first note, was left inside her house after an intruder had broken open the door. Arita-Deras also received several telephone text messages from Ricardo threatening to kidnap and kill her if Pineda-Vidal did not return to Honduras. After receiving these multiple threats, Arita-Deras fled with her son to the United States.

After considering Arita-Deras' testimony and corroborating evidence, the IJ found that her testimony was credible. However, the IJ also found that corroborating evidence was necessary to evaluate Arita-Deras' fear of future harm.[3] The IJ ultimately discounted the corroborating evidence presented by Arita-Deras for two primary reasons: (1) purported

---

[2] One of Pineda-Vidal's other brothers, who fled to the United States after Arita-Deras' departure, has received asylum based on the same facts presented in this case.

[3] While the IJ initially stated that corroborating evidence was necessary for Arita-Deras' showing of future harm, he also focused on the lack of corroboration for any connection between Arita-Deras' susceptibility to future harm and her family ties. Accordingly, we will view the IJ's analysis of the corroborating evidence as also encompassing the nexus element of Arita-Deras' asylum claim.

omissions from the affidavits regarding the identity of Arita-Deras' persecutor and the evidence of nexus; and (2) the self-interested nature of Arita-Deras' submitted affidavits and Pineda-Vidal's failure to testify before the IJ.[4]

On the merits of Arita-Deras' asylum and withholding of removal claims, the IJ concluded that Arita-Deras had not suffered past persecution because she had not been harmed physically, and because she only had experienced "isolated incidents of mistreatment."[5] The IJ also found that Arita-Deras had failed to establish that any persecution she suffered was because of her familial relationship with Pineda-Vidal. And, finally, the IJ rejected Arita-Deras' CAT claim, concluding that she failed to establish that it was more likely than not that she would be tortured if she returned to Honduras. Arita-Deras appealed the IJ's decision to the Board.

The Board adopted most of the IJ's legal analysis, affirming the IJ's decision and dismissing the appeal.[6] Arita-Deras filed the present petition for review.

---

[4] The IJ also found that the State Department's Honduras 2016 Human Rights Report failed to corroborate Arita-Deras' specific situation. However, because the Report is applicable to broader country conditions rather than to Arita-Deras' individual circumstances, we do not address the IJ's conclusion regarding the Report.

[5] The IJ further found that despite Arita-Deras filing her new asylum application outside the mandatory one-year filing period, her delay was reasonable, and, therefore, her application was not time-barred. The government does not challenge this ruling.

[6] Given its other rulings, the Board explicitly declined to opine on the IJ's findings regarding relocation and the inability or unwillingness of the Honduran government to protect Arita-Deras.

## II.

When the Board adopts the analysis used by the IJ but "supplements it with its own reasoning," we review both decisions. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015). In such instances, we limit our consideration of the IJ's opinion to the portions that have been adopted and incorporated into the Board's decision. *Yu An Li v. Holder*, 745 F.3d 336, 341 (8th Cir. 2014) ("[T]hus, we examine only that part of the IJ's decision the B[oard] adopted."); *cf. Hernandez-Avalos*, 784 F.3d at 948 (noting that we do not review IJ opinions the Board declines to adopt). We review legal questions de novo and factual findings for substantial evidence, treating the agency's factual findings as conclusive unless any reasonable adjudicator could only reach a contrary conclusion. *Cedillos-Cedillos v. Barr*, 962 F.3d 817, 823 (4th Cir. 2020); *see also* 8 U.S.C. § 1252(b)(4)(B). A removal order is valid unless it is manifestly contrary to law and constitutes an abuse of discretion. 8 U.S.C. § 1252(b)(4)(D).

While our standard of review in immigration cases is deferential, our method of review is not cursory. *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019). The Board, through its opinion, must demonstrate that it considered all the evidence presented and must articulate a "cogent" basis supporting any conclusion that the evidence was insufficient. *Id.* at 153. The Board abuses its discretion when it ignores important evidence supporting an applicant's claim or misapplies the law. *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017); *see also Menghesha v. Gonzales*, 450 F.3d 142, 147-48 (4th Cir. 2006).

In explaining their reasoning, the Board and the IJ may not ignore legally significant evidence and base their decision on only isolated portions of the record. *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020). Moreover, factual findings made in the application of an incorrect legal standard are not accorded any deference. *See Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 395 (2d Cir. 2005) (noting that courts defer to an IJ's factual findings when the findings are not "infected by legal error"); *cf. Consol. Coal Co. v. Loc. 1643, United Mine Workers of Am.*, 48 F.3d 125, 128 (4th Cir. 1995) (applying the principle to clear error review of factual findings); *Al-Saadoon v. Lynch*, 816 F.3d 1012, 1014 (8th Cir. 2016) (same in the context of a naturalization petition).

An alien seeking asylum under 8 U.S.C. § 1101(a)(42)(A) must produce evidence establishing three elements: (1) that the applicant has suffered past persecution or has a well-founded fear of future persecution; (2) that the persecution is "on account of" her race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that her home country's government is unable or unwilling to control. *Zavaleta-Policiano*, 873 F.3d at 246; 8 U.S.C. §§ 1101(a)(42), 1158.

If an alien demonstrates past persecution in her home country on account of a protected ground and the home government's inability to control the persecutor, she is afforded a presumption of a well-founded fear of persecution. *Li Fang Lin v. Mukasey*, 517 F.3d 685, 692-93 (4th Cir. 2008); 8 C.F.R. § 1208.13(b)(1). Upon such a showing, the burden shifts to the government to establish by a preponderance of the evidence that either (1) there has been a fundamental change in circumstances such that the applicant's well-

founded fear of persecution no longer exists, or (2) the applicant could avoid further persecution by relocating to a different part of the applicant's home country. *Li Fang Lin*, 517 F.3d at 693; 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B).

Arita-Deras raises three primary issues on appeal: (1) the rejection of her corroborating evidence; (2) the conclusion that she had not suffered past persecution; and (3) the determination that any persecution she suffered was not based on her family relationship with Pineda-Vidal. We will address these arguments in turn.

Arita-Deras asserts that her corroborating evidence, namely, the affidavits, burial permits, and other documentation, sufficiently supported her asylum claim. She argues that the IJ placed undue weight on Pineda-Vidal's failure to testify in person and discounted the evidentiary value of her corroborating evidence.

In response, the government contends that the IJ properly determined that Arita-Deras' documentary evidence did not adequately corroborate her testimony. The government argues that the IJ provided two cogent rationales for discounting the corroborating evidence: (1) the generic references in the affidavits to "gangs" or "enemies," rather than to Ricardo by name; and (2) the self-interested nature of Arita-Deras' submitted affidavits combined with Pineda-Vidal's failure to testify in person. We disagree with the government's argument.

An asylum applicant bears the burden of proving her eligibility for relief. *Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018). Under the INA, an asylum applicant's testimony, of itself, may be sufficient to support her application if the trier of fact finds that

her testimony is credible and persuasive, and that it presents sufficient evidence to establish she is a refugee. 8 U.S.C. § 1158(b)(1)(B)(ii). However, even when the applicant's testimony is deemed credible, the trier of fact still may require the applicant to present corroborating evidence "unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.* When the trier of fact requires such corroboration, the evidence requested must be reasonable and be tied to the elements the applicant must prove. *See Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001) (applying a Board decision holding that an IJ can require corroboration on facts central to an applicant's claim); *Kyaw Zwar Tun v. U.S.I.N.S.*, 445 F.3d 554, 563 (2d Cir. 2006) ("An applicant may be required to provide any reasonably available documentation to corroborate *the elements of her claim*." (emphasis added)); *cf. Darinchuluun v. Lynch*, 804 F.3d 1208, 1210, 1216 (7th Cir. 2015) (noting that an applicant failed to provide corroborating evidence on the "key elements" of his asylum claim).

Here, the reference in the affidavits to "gangs" and "enemies," rather than to Ricardo by name, did not diminish their corroborative value in view of the other evidence presented. Moreover, the identification of Ricardo by name was not necessary to establish any element of Arita-Deras' asylum claim. A person can suffer persecution without ever learning the names of the individuals who have subjected her to that persecution. *See Cardenas v. INS*, 294 F.3d 1062, 1066 (9th Cir. 2002); *Romilus v. Ashcroft*, 385 F.3d 1, 7 (1st Cir. 2004). Likewise, the names of the actual persecutors need not be proved to satisfy the nexus requirement, provided that the applicant can establish a connection between the persecution she suffered and the protected ground. *See Sugiarto v. Holder*, 586 F.3d 90, 95-96 (1st Cir.

2009); *see also Romilus*, 385 F.3d at 7. Thus, because the actual identity of her persecutor was not an element of either the past persecution inquiry or the nexus inquiry, Arita-Deras was not required to corroborate that Ricardo was the source of the death threats she received based on her familial relationship to Pineda-Vidal. Accordingly, we hold that the IJ erred as a matter of law in discounting the affidavits on this basis.

The IJ's decision to afford little weight to Pineda-Vidal's affidavit likewise was flawed. Undoubtedly, an IJ may require an applicant to produce corroborating evidence, even when the applicant provided credible testimony. 8 U.S.C. § 1158(b)(1)(B)(ii). However, the statute does not impose any limitations on the type of additional evidence an applicant may submit. By categorically rejecting Pineda-Vidal's affidavit, the IJ effectively read into the statute a requirement that an applicant submit corroborating *testimony* rather than corroborating *evidence*. This approach was counter to the Board's own precedent instructing IJs to "not place undue weight on the absence of a particular piece of corroborating evidence while overlooking other [pieces of corroborating] evidence in the record." *In re L-A-C-*, 26 I. & N. Dec. 516, 522 (B.I.A. 2015).

The IJ provided no plausible basis for this requirement for a certain type of evidence, in violation of the Board's precedent. Pineda-Vidal's affidavit provided the same information the IJ sought through live testimony, and the IJ identified no specific deficiencies with the affidavit that testimony could cure. To the contrary, the IJ's only proffered reason for requiring testimony, namely, that Pineda-Vidal was a self-interested party, would be equally true whether Pineda-Vidal provided evidence as an affiant or as a

12

live witness. As further explained below, his self-interested status, of itself, was not a valid reason to discount the affidavit.

Here, by focusing narrowly on the absence of live testimony from Pineda-Vidal, the IJ failed to examine thoroughly the content of Pineda-Vidal's affidavit. Nor did the IJ identify any inconsistencies between the affidavit and Arita-Deras' testimony that would bring the substance of the affidavit into question. *See Trujillo Diaz v. Sessions*, 880 F.3d 244, 253 n.4 (6th Cir. 2018) (explaining that the Board abused its discretion by discrediting an affidavit when consistent with the other evidence in the record); *see also Marynenka v. Holder*, 592 F.3d 594, 602 (4th Cir. 2010) (holding that the IJ erred in requiring further corroboration for corroborating evidence presented by the applicant). Because the IJ found that Arita-Deras' testimony was credible, the absence of inconsistencies between her testimony and Pineda-Vidal's affidavit supported the affidavit's corroborative value.

We also disagree with the IJ's decision flatly discounting Arita-Deras' submitted affidavits, especially Pineda-Vidal's, as self-interested. Although in dicta we have previously questioned the evidentiary value of affidavits from family members and friends, we have done so in cases when the IJ has made an adverse credibility determination against the applicant. *See Singh v. Holder*, 699 F.3d 321, 331-32 (4th Cir. 2012). But here, the IJ found that Arita-Deras was a credible witness, and the information in the submitted affidavits aligned with her credible testimony.[7] An IJ has wide discretion to examine an

---

[7] We further note that if we were to accept the government's position that affidavits from relatives and friends lack corroborative value, asylum applicants asserting persecution based on their membership in a nuclear family rarely, if ever, would be able to

affidavit for validity and evidentiary weight, but this latitude does not extend to summarily rejecting an affidavit on impermissible grounds. *See generally Turkson v. Holder*, 667 F.3d 523, 527 (4th Cir. 2012) (explaining the unique position of fact-finders to weigh evidence); *Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015) (explaining that IJs have "ample discretion in assessing credibility"). Thus, we hold that the Board erred in adopting the IJ's rationale regarding the corroborating evidence in this case.

## B.

We next observe that the Board concluded that Arita-Deras failed to establish past persecution because she had not been harmed physically. Although the government does not expressly defend this position on appeal, we nevertheless address it here as a component of the Board's opinion affirming the IJ's decision.

We repeatedly have held that death threats qualify as persecution, *see Zavaleta-Policiano*, 873 F.3d at 247, and we recently rejected any requirement that an applicant suffer physical harm in order to prove persecution resulting from such death threats, *Bedoya v. Barr*, 981 F.3d 240, 246 (4th Cir. 2020). Accordingly, the Board erred as a matter of law in requiring Arita-Deras to demonstrate that she suffered physical harm in conjunction with the death threats she received. And the record is clear that Arita-Deras

---

corroborate their claims. Family members and friends are the individuals with the relevant information regarding an applicant's claimed persecution and, thus, are often the only potential source of corroboration available. We decline to adopt such a categorical rule. *See Arrazabal v. Barr*, 929 F.3d 451, 462-63 (7th Cir. 2019) ("A particular witness may or may not be credible, and his or her relationship with the [applicant] certainly factors into that determination, but to summarily discredit his testimony solely because he or she has a connection with the [applicant] would not be appropriate.").

14

received multiple death threats. These threats, in both written and electronic form, conveyed that Arita-Deras would be kidnapped and killed to force Pineda-Vidal to return to Honduras. Thus, the Board committed legal error in concluding that Arita-Deras had not established past persecution.

C.

Finally, both the IJ and the Board determined that Arita-Deras had not satisfied her burden to establish a nexus, or connection, between any persecution she suffered and her family. Arita-Deras argues that the Board applied the wrong standard, by examining whether her family relationship was *the* central reason rather than *a* central reason for her persecution, in assessing the nexus element of her asylum claim. She asserts that the Board ignored undisputed evidence establishing that her familial relationship with Pineda-Vidal was at least one central reason for the persecution she faced.

In response, the government contends that Arita-Deras' fear related only to concerns of generalized violence and criminality, rather than to a particularized fear based on her membership in Pineda-Vidal's family. The government also argues that Arita-Deras did not know the reason why Ricardo was targeting Pineda-Vidal. We disagree with the government's position.

As noted above, to present a valid asylum claim, an applicant must demonstrate that the persecution she fears is "on account of a protected ground." *Hernandez-Avalos*, 784 F.3d at 948-49; 8 U.S.C. § 1101(a)(42)(A). Acts of persecution satisfy this statutory requirement if they are motivated by race, religion, nationality, membership in a particular social group, or a political opinion. 8 U.S.C. § 1101(a)(42)(A). The Board assumed

15

without deciding that Arita-Deras' membership in the family of Pineda-Vidal qualified as membership in a particular social group.

In accordance with our precedent, we treat membership in a nuclear family as a particular social group.[8]  *See Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017) (recognizing membership in a nuclear family as a particular social group).  To satisfy the nexus requirement, an applicant must demonstrate that the protected ground "serves as at least one central reason for the persecution."  *Zavaleta-Policiano*, 873 F.3d at 247 (citation and internal quotation marks omitted).  We have emphasized that an applicant need not demonstrate that the protected ground was the sole "central reason or even a dominant central reason for persecution."  *Id.* (citation omitted).

Here, the evidence established that Arita-Deras' familial relationship with Pineda-Vidal was at least one central reason for her persecution and, likely, was the dominant reason.  The written threats Arita-Deras received referenced Pineda-Vidal and explicitly tied the threats against her to the gang's attempt to force Pineda-Vidal to return to Honduras.  Arita-Deras credibly testified that Ricardo had issued oral threats outside the house in which she and Pineda-Vidal lived in La Laguna.  And, significantly, Ricardo had

---

[8] In concurring with the IJ's nexus analysis, the Board mentioned *In re L-E-A-*, 27 I. & N. Dec. 581 (A.G. 2019), which suggests that a family relationship may not be a valid particular social group to support an asylum claim.  However, the Board expressly declined to address the applicability of *In re L-E-A-* to this case, instead holding that Arita-Deras failed to establish a nexus regardless of the validity of her proposed particular social group.  We therefore will apply our longstanding analysis that a family relationship qualifies as a particular social group and decline Arita-Deras' invitation to address the merits of the Attorney General's opinion.  *See Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017) (citing *Hernandez-Avalos*, 784 F.3d at 949).

acted on his threats of violence by killing Pineda-Vidal's father, brother, and brother-in-law, as corroborated by the death and burial certificates produced at the hearing. This evidence demonstrated a clear pattern of violence all related to the family membership of Pineda-Vidal.

Each of the affidavits Arita-Deras presented references threats of violence and death against Pineda-Vidal's family. More specifically, these affidavits stated that the threats of violence were directly connected to familial relationships with Pineda-Vidal. This evidence plainly was sufficient to establish that Arita-Deras' familial relationship with Pineda-Vidal was at least one central reason for her persecution. *Id.* Regardless of Ricardo's motivation to target Pineda-Vidal, it is clear that he targeted Arita-Deras based on this protected ground. *See Hernandez-Cartagena v. Barr*, 977 F.3d 316, 320 (4th Cir. 2020) ("[T]he relevant analysis is not whether the applicant's *family* was persecuted because of a protected ground, but rather whether the *applicant himself* was persecuted because of a protected ground."). And, as we have explained, there was no need for Arita-Deras to establish that Ricardo was the specific perpetrator; rather, she needed only to demonstrate that her familial relationship with Pineda-Vidal was one central reason for the persecution she experienced. *See Romilus*, 385 F.3d at 7; *Zavaleta-Policiano*, 873 F.3d at 247 (describing the one central reason test). The actions described in Arita-Deras' testimony and the affidavits conclusively established that Arita-Deras received threats of violence and death because of her relationship with Pineda-Vidal. If she were not married to Pineda-Vidal, she would not have been targeted with these threats. *See Hernandez-Avalos*, 784 F.3d at 950 (relationship with son is the reason that the applicant, and not

17

someone else, was threatened).  We therefore hold that the Board committed legal error in concluding that Arita-Deras had not established a nexus between her persecution and her particular social group.[9]

### III.

In sum, we conclude that the Board erred as a matter of law in relying on the cited reasons for rejecting Arita-Deras' corroborating evidence.  We further conclude as a matter of law that Arita-Deras suffered past persecution on account of a protected ground, and we remand the case to the Board for further consideration of Arita-Deras' asylum claim so that she may receive the benefit of the presumption that she has a well-founded fear of future persecution if she returns to Honduras.[10]  *See Baharon v. Holder*, 588 F.3d 228, 233-34 (4th Cir. 2009); 8 C.F.R. § 1208.13(b)(1).  We vacate the Board's decision and remand the case for further proceedings consistent with the principles expressed in this opinion.

*PETITION FOR REVIEW GRANTED*

---

[9] The Board expressly declined to address the IJ's findings on relocation and the inability or unwillingness of the Honduran government to protect Arita-Deras.  When the Board declines to address the IJ's findings on particular issues and fails to address those issues in its own opinion, we do not consider them on appeal.  *INS v. Orlando Ventura*, 537 U.S. 12, 13-14 (2002).

[10] Based on our holding, we do not reach the merits of the Board's additional rulings on Arita-Deras' claims for withholding of removal and for protection under the CAT.  We direct the Board to reevaluate those claims following its reconsideration of Arita-Deras' asylum application.